## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ABDUL HIRANI, Derivatively on Behalf of Nominal Defendant SOLAREDGE TECHNOLOGIES, INC., | ) ) ) | |
| | ) | Case No. _____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| ZVI LANDO, RONEN FAIER, NADAV ZAFRIR, BETSY ATKINS, MARCEL GANI, DANA GROSS, DIRK HOKE, AVERY MORE, and TAL PAYNE, | ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SOLAREDGE TECHNOLOGIES, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

### <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Abdul Hirani ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant SolarEdge Technologies, Inc. ("SolarEdge" or the "Company"), against certain of the Company's current and former executive officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press

releases published by and regarding SolarEdge, legal filings, news reports, securities analysts' reports about the Company, the securities class action captioned *In re SolarEdge Technologies, Inc.*, Case No. 1:23-cv-09748-GHW (S.D.N.Y) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of SolarEdge against certain current and former officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties to the Company and its stockholders between May 3, 2023 and October 19, 2023 (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.     SolarEdge designs, develops, and sells an intelligent inverter solution designed to maximize power generation at the individual photovoltaic ("PV") module level.

3.     The Company's products consist of: (i) power optimizers designed to maximize energy; (ii) inverters which invert direct current ("DC") from the PV module to alternating current ("AC"), including the Company's "Energy Hub" inverter which supports, among other things, connection to a DC-coupled battery for full or partial home backup, and optional connection to the Company's smart electric vehicle ("EV") charger; (iii) a remote cloud-based monitoring platform, that collects and processes information from the power optimizers and inverters to enable customers and system owners, to monitor and manage the solar PV system; (iv) a residential storage and backup solution which includes a company designed and manufactured lithium-ion

---

[1] The Individual Defendants are Zvi Lando ("Lando"), Ronen Faier ("Faier"), Nadav Zafrir ("Zafrir"), Betsy Atkins ("Atkins"), Marcel Gani ("Gani"), Dana Gross ("Gross"), Dirk Hoke ("Hoke"), Avery More ("More"), and Tal Payne ("Payne"). "Defendants" means SolarEdge and the Individual Defendants.

DC-coupled battery that is used to increase energy independence and maximize self-consumption for homeowners including a battery; and (v) additional smart energy management solutions.

4.      As detailed herein, throughout the Relevant Period, the Individual Defendants continuously touted the Company's financial success, particularly the growth of the Company's market in Europe, and the increased business revenue associated therewith.

5.      However, the truth was revealed on October 19, 2023, when, after the market closed, SolarEdge issued a press release announcing its preliminary financial results for the third quarter of 2023 (the "3Q23 Preliminary Financial Results Press Release"). In the 3Q23 Preliminary Financial Results Press Release, Defendant Lando stated, in relevant part, "[d]uring the second part of the third quarter of 2023, we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors . . . . We attribute these cancellations and pushouts to higher than expected inventory in the channels and slower than expected installation rates."

6.      The 3Q23 Preliminary Financial Results Press Release went on to reveal that "third quarter revenue, gross margin and operating income will be below the low end of the prior guidance range" and that third quarter revenue was expected to be $720 to $730 million, a decrease from the previous expectation of $880 to $920 million.

7.      On this news, the Company's stock price fell approximately 27%, or $31.08 per share, to close at $82.90 per share on October 20, 2023.

8.      As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors that: (i) the Company's European distribution channels

had high inventory levels; (ii) the Company was experiencing a significant amount of cancellations and pushouts of existing backlog from its European distributors; (iii) the Company's backlog and guidance was overstated; and (iv) as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

9.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Lando and Faier.  The Securities Class Action has exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect

in this District.

## **PARTIES**

### *Plaintiff*

15.     Plaintiff is, and has been at all relevant times, a shareholder of SolarEdge.

### *Nominal Defendant*

16.     Nominal Defendant SolarEdge is a Delaware corporation with its principal executive offices located in Israel.  SolarEdge's common stock trades on the NASDAQ, which is headquartered in this District, under the ticker symbol "SEDG."

### *Individual Defendants*

17.     Defendant Lando has served as Chief Executive Officer ("CEO") and a director of the Company since August 2019. Lando previously served as the Company's Vice President of Global Sales from 2009 until August 2019.

18.     Defendant Faier has served as Chief Financial Officer ("CFO") of the Company since 2011.

19.     Defendant Zafrir has served as Chairman of the Board since 2019. Zafrir serves as a member of the Board's Compensation Committee, Nominating and Corporate Governance Committee, and Technology Committee.

20.     Defendant Atkins has served as a director of the Company since 2021. Atkins also serves as Chair of the Board's Nominating and Corporate Governance Committee and a member of the Technology Committee and Compensation Committee.

21.     Defendant Gani has served as a director since 2015. Gani also serves as Chair of the Board's Audit Committee.

22.     Defendant Gross has served as a director since July 2023. Gross also serves as a member of the Board's Audit Committee.

23.     Defendant Hoke has served as a director of the Company since 2022. Hoke also serves as a member of the Board's Nominating and Corporate Governance Committee.

24.     Defendant More has served as a director of the Company since 2006. More also serves as Chair of the Board's Compensation Committee and Technology Committee and a member of the Audit Committee.

25.     Defendant Payne has served as a director of the Company since 2015. Payne also serves as a member of the Board's Audit Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers and/or directors of SolarEdge, and because of their ability to control the business and corporate affairs of SolarEdge, the Individual Defendants owed SolarEdge and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SolarEdge in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of SolarEdge and its shareholders.

27.     Each director and officer of the Company owes to SolarEdge and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SolarEdge, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.     To discharge their duties, the officers and directors of SolarEdge were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

30. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of SolarEdge, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

32. To discharge their duties, the officers and directors of SolarEdge were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of SolarEdge were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to SolarEdge's own Code of Business Conduct and Ethics for Members of the Board of Directors (the "Board's Code of Conduct") and Employee Code of Conduct (collectively, the "Codes of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)   Remain informed as to how SolarEdge conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of SolarEdge and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that SolarEdge's operations would comply with all applicable laws and SolarEdge's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

33.    Each of the Individual Defendants further owed to SolarEdge and the shareholders the duty of loyalty requiring that each favor SolarEdge's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

34.    At all times relevant hereto, the Individual Defendants were the agents of each other and of SolarEdge and were at all times acting within the course and scope of such agency.

35.    Because of their advisory, executive, managerial, and directorial positions with SolarEdge, each of the Individual Defendants had access to adverse, non-public information about the Company.

36.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SolarEdge.

## SOLAREDGE'S CODES OF CONDUCT

### The Board's Code of Conduct

37.    The Board's Code of Conduct specifically applies to members of the Board and states that its purpose is to "focus the Board and each director on areas of ethical risk, provide guidance to directors to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability."

38.     In a section titled, "Director Responsibilities," the Board's Code of Conduct states that:

> The board represents the interests of stockholders, as owners of a corporation, in optimizing long-term value by overseeing management performance on the stockholders' behalf.   The board's responsibilities in performing this oversight function include a duty of care and a duty of loyalty.
>
> A director's duty of care refers to the responsibility to exercise appropriate diligence in overseeing the management of a corporation, making decisions and taking other actions.  In meeting the duty of care, directors are expected to:
>
> - *Attend and participate in Board and committee meetings.* Personal participation is required.  Directors may not vote or participate by proxy.
>
> - *Remain properly informed about the corporation's business and affairs.* Directors should review and devote appropriate time to studying Board materials.
>
> - *Rely on others.* Absent knowledge that makes reliance unwarranted, directors may rely on Board committees, management, employees, and professional advisors.
>
> - *Make inquiries.* Directors should make inquiries about potential problems that come to their attention and follow up until they are reasonably satisfied that management is addressing them appropriately.
>
> A director's duty of loyalty refers to the responsibility to act in good faith and in the best interests of the corporation and its stockholders, not the interests of the director, a family member or an organization with which the director is affiliated. Directors should not use their positions for personal gain. The duty of loyalty may be relevant in cases of conflict of interest (section 2 below), and corporate opportunities (section 3 below).

39.     In a section titled "Compliance with laws, rules, and regulations: fair dealing," the Board's Code of Conduct states, in relevant part, that "[d]irectors shall comply, and oversee compliance by employees, officers, and other directors, with laws, rules and regulations applicable to the Company, including insider trading laws."

40.     The Board's Code of Conduct states that "[d]irectors who also serve as officers of the Company should read this Code in conjunction with the Company's Employee Code of

Conduct."

***Employee Code of Conduct***

41.     SolarEdge's Employee Code of Conduct applies to "all officers and employees of [SolarEdge] and service providers offering services that are similar in nature to employee services."

42.     The Employee Code of Conduct states that its purpose is to "highlight areas of ethical risk, provide guidance in recognizing and dealing with ethical issues and establish mechanisms to report unethical conduct."

43.     In a section titled "Compliance with Laws," the Employee Code of Conduct states:

> It is the Company's policy to comply with all laws, rules, regulations, and Company policies. It is the personal responsibility of employees to adhere honestly and in good faith to the standards and restrictions imposed by those laws, rules, regulations, and Company policies. Although no employee is expected to know the details of all these laws, rules, and regulations, it is important for employees to have a general understanding of the specific laws, rules and regulations that are relevant to their areas of responsibility at the Company.

44.     In a section titled "Misleading Books and Records and Public Reporting," the Code of Conduct states, in relevant part:

> As a public company, the Company files financial statements and other information with the U.S. Securities and Exchange Commission ("SEC"). Employees are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of financial and non-financial information that may be material to the Company. Reports and other documents that the Company files with or submits to the SEC, and other public communications, should contain full, fair, accurate, timely and understandable disclosure.

## SOLAREDGE'S AUDIT COMMITTEE CHARTER

45.     SolarEdge's Audit Committee Charter states that the purpose of the Audit Committee is to:

- represent and assist the Board of Directors in discharging its oversight responsibility relating to: (i) the accounting and financial reporting processes of the Company and its subsidiaries, including the audits of the Company's financial statements and the integrity of the financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the outside auditor's qualifications, independence and performance; and (iv) the design, implementation and performance of the Company's internal audit function; and

- oversee preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

46. The Audit Committee Charter states that the Audit Committee will:

(a) Be directly responsible, in its capacity as a committee of the Board, for the appointment, compensation, retention and oversight of the work of the outside auditor. In this regard, the Audit Committee will appoint and retain (subject to ratification by the Company's stockholders), compensate, evaluate, and terminate when appropriate, the outside auditor, which will report directly to the Audit Committee.

(b) Oversee implementation of new accounting standards by having the outside auditor's report on a quarterly basis on accounting standards that could impact the Company's business.

(c) Obtain and review, at least annually, a report by the outside auditor describing: (i) the outside auditor's internal quality-control procedures; and (ii) any material issues raised by the most recent internal quality-control review, or peer review, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the outside auditor, and any steps taken to deal with any such issues.

(d) Approve in advance all audit and permissible non-audit services to be provided by the outside auditor, and establish policies and procedures for the pre-approval of audit and permissible non-audit services to be provided by the outside auditor.

(e) At least annually, consider the independence of the outside auditor, and, consistent with rules of the Public Company Accounting Oversight Board ("PCAOB"), obtain and review a report by the outside auditor describing any relationships between the outside auditor, and the Company or individuals in financial reporting oversight roles at the Company, that may reasonably be thought to bear on the outside auditor's independence and discuss with the outside auditor the potential effects of any such relationships on independence.

(f) Review and discuss with the outside auditor the matters required to be discussed by the outside auditor under Auditing Standard No. 16, as adopted by the PCAOB

and amended from time to time, including any problems or difficulties the outside auditor encountered in the course of its audit work and management's response.

(g) Meet to review and discuss with management and the outside auditor the annual audited and quarterly financial statements of the Company (including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") and the independent auditor's reports related to the financial statements.

(h) Recommend to the Board based on the review and discussion described in paragraphs (d) - (f) above, whether the financial statements should be included in the Annual Report on Form 10-K.

(i) Receive reports from the outside auditor and management regarding, and review and discuss the adequacy and effectiveness of, the Company's internal controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Audit Committee by the outside auditor or management.

(j) Receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

(k) Review and discuss with the principal internal auditor of the Company: (1) the annual audit plan and the adequacy of internal audit resources; and (2) the results of the internal audit program.

(l) Annually review and discuss the performance and effectiveness of the internal audit function.

(m) Review and concur in the appointment, and dismissal when appropriate, and compensation of the principal internal auditor.

(n) Review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

(o) Review and discuss the Company's practices with respect to risk assessment and risk management.

(p) At least annually, review and approve on behalf of the Company and its applicable subsidiaries, the Company's decision to enter into swaps that are exempt from exchange-execution and clearing under "end-user exception" regulations established by the Commodity Futures Trading Commission, and review and discuss with management applicable Company policies governing the Company's use of swaps subject to the end-user exception.

(q) Oversee the Company's compliance program with respect to legal and regulatory requirements, including the Company's code(s) of conduct and the Company's policies and procedures for monitoring compliance; and at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the general counsel, who shall have the authority to communicate directly to the Audit Committee, promptly, about actual and alleged violations of law or the Company's code(s) of conduct, including any matters involving criminal or potential criminal conduct.

(r) Establish and oversee procedures for handling reports of potential misconduct, including: (1) violations of law or the Company's code(s) of conduct; (2) complaints regarding accounting, internal accounting controls, auditing and federal securities law matters; and (3) the confidential, anonymous submission of concerns by employees regarding accounting, internal accounting controls, auditing and federal securities law matters.

(s) Establish and periodically review policies and procedures for the review, approval and ratification of related person transactions, as defined in applicable SEC rules, and review related person transactions.

(t) Establish policies for the hiring of employees and former employees of the outside auditor.

(u) Assess the Company's risk management survey and the underlying internal audit plan.

(v) Annually evaluate the performance of the Audit Committee and assess the adequacy of the Audit Committee charter.

## <u>SUBSTANTIVE ALLEGATIONS</u>

### *Background*

47.     SolarEdge designs, develops, and sells an intelligent inverter solution designed to maximize power generation at the individual PV module level while lowering the cost of energy produced by the solar PV system and providing comprehensive and advanced safety features.

48.     The Company's products consist of: (i) power optimizers designed to maximize energy; (ii) inverters which invert DC from the PV module to AC, including the Company's "Energy Hub" inverter which supports, among other things, connection to a DC-coupled battery for full or partial home backup, and optional connection to the Company's smart EV charger; (iii)

14

a remote cloud-based monitoring platform, that collects and processes information from the power optimizers and inverters to enable customers and system owners, to monitor and manage the solar PV system; (iv) a residential storage and backup solution which includes a company designed and manufactured lithium-ion DC-coupled battery that is used to increase energy independence and maximize self-consumption for homeowners including a battery; and (v) additional smart energy management solutions.

49.     The Company sells its products worldwide through large distributors and electrical equipment wholesalers, as well as directly to large solar installers and engineering, procurement, and construction firms.

50.     According to the Company's public filings, since 2010, SolarEdge's products have been installed in solar PV systems in over 140 countries.

### Individual Defendants' Materially False and Misleading Statements

51.     Throughout the Relevant Period, the Individual Defendants continuously touted the Company's financial success, particularly the growth of the Company's market in Europe, and the increased business revenue associated therewith.

52.     For instance, on May 3, 2023, at the start of the Relevant Period, the Company issued a press release announcing its financial results for the first quarter of 2023 (the "Q123 Press Release"). In the Q123 Press Release, Defendant Lando stated "[w]e are pleased with our first quarter results reflecting our strong global presence and execution capabilities."

53.     The Q123 Press Release went on to state, in relevant part:

**First Quarter 2023 Summary**

The Company reported record revenues of $943.9 million, up 6% from $890.7 million in the prior quarter and up 44% from $655.1 million in the same quarter last year.

Revenues from the solar segment were a record $908.5 million, up 9% from $837.0 million in the prior quarter and up 49% from $608.0 million in the same quarter last year.

GAAP gross margin was 31.8%, up from 29.3% in the prior quarter and up from 27.3% in the same quarter last year.

Non-GAAP gross margin was 32.6%, up from 30.2% in the prior quarter and up from 28.4% in the same quarter last year.

Gross margin from the solar segment was 35%, up from 32.4% in the prior quarter and up from 30.2% in the same quarter last year. . . .

**Outlook for the Second Quarter 2023**

The Company also provides guidance for the second quarter ending June 30, 2023 as follows:

- Revenues to be within the range of $970 million to $1,010 million

- Non-GAAP gross margin expected to be within the range of 32% to 35%

- Non-GAAP operating profit to be within the range of $195 million to $215 million

- Revenues from the solar segment to be within the range of $930 million to $980 million

- Gross margin from the solar segment expected to be within the range of 34% to 37%.

54.     Also on May 3, 2023, the Company held an earnings call for the first quarter of 2023 (the "Q123 Earnings Call"). In the Q123 Earnings Call, Defendant Lando touted the Company's financial success, stating that:

Revenues from our solar business were at a record $909 million, while revenues from our non-solar business were $35 million. This quarter, we shipped 6.4 million in power optimizers and 330,000 inverters. This quarter, we also shipped 221-megawatt hour of residential batteries, a slight increase from last quarter. Our solar business revenue grew quarter over quarter by 9% and by 49% year over year, mostly driven by record revenues in Europe and Rest of World.

55.     Defendant Lando went on to emphasize the success of the Company in the European market, stating, in relevant part:

> The European residential markets continues to be very strong for us this quarter as we ramp shipments of three-phase residential inverters, in particular, our new backup inverter, as well as the three-phase residential battery. We expect this momentum to continue in the coming quarters as we are still increasing capacity of backup inverters to deliver on the significant backlog and the strong demand for this product. . . .

56.     Additionally, in the Questions and Answers portion of the Q123 Earnings Call, when asked about the Company's commercial and industrial ("C&I") business and backlog, Defendant Lando stated, in relevant part, that "[t]he backlog for C&I is very strong for the remaining of the year."

57.     In response to a question about the financial expectations for the second and third quarters of 2023, Defendant Lando also stated that "we continue to see the European market strong, and we are sitting on a robust backlog that we intend to deliver between now and the end of the year."

58.     Also during the Q123 Earnings Call, Defendant Faier highlighted the increased revenues in Europe, stating:

> Solar revenues from Europe were a record $577.1 million, a 22% increase from the last quarter and 102% increase from the same quarter last year, representing 63.5% of our solar revenues. Two countries in Europe represented well above $100 million each and we achieved record revenue in several countries. In particular, we saw meaningful quarter-over-quarter growth in Germany with 17%, Switzerland with 177%, Austria with 253%, and France with 31% growth. Revenues from batteries grew slightly this quarter in Europe, limited by the fact that we are still ramping three-phase inverter supply, which is needed for battery coupled systems.

59.     On May 8, 2023, the Company filed its quarterly report for the first quarter of 2023 on a Form 10-Q with the SEC (the "1Q23 10-Q"). The 1Q23 10-Q touted the Company's drastic increase in revenue during the first quarter, stating:

Revenues increased by $288.8 million, or 44.1%, in the three months ended March 31, 2023 as compared to the three months ended March 31, 2022, primarily due to (i) an increase of $245.4 million related to the number of inverters and power optimizers sold, with significant growth in revenues coming from Europe; and (ii) an increase of $64.6 million related to the number of residential batteries, sold primarily in Europe. Revenues from outside of the U.S. comprised 72.6% of our revenues in the three months ended March 31, 2023 as compared to 59.4% in the three months ended March 31, 2022.

60.     The 1Q23 10-Q was signed by Defendants Lando and Faier.

61.     On August 1, 2023, the Company issued a press release announcing its financial results for the second quarter of 2023 (the "2Q23 Press Release"). In the 2Q23 Press Release, Defendant Lando stated "[w]e are pleased with our results for the second quarter, in particular our strong performance in Europe in both the residential and commercial solar segments."

62.     The 2Q23 Press Release went on to highlight the Company's financial success in the second quarter and anticipated future financial success, stating, in relevant part:

**Second Quarter 2023 Summary**

The Company reported record revenues of $991.3 million, up 5% from $943.9 million in the prior quarter and up 36% from $727.8 million in the same quarter last year.

Revenues from the solar segment were a record $947.4 million, up 4% from $908.5 million in the prior quarter and up 38% from $687.6 million in the same quarter last year.

GAAP gross margin was 32.0%, up from 31.8% in the prior quarter and up from 25.1% in the same quarter last year.

Non-GAAP gross margin* was 32.7%, up slightly from 32.6% in the prior quarter and up from 26.7% in the same quarter last year.

Gross margin from the solar segment was 34.7%, down slightly from 35.0% in the prior quarter and up from 28.1% in the same quarter last year. . . .

**Outlook for Third Quarter 2023**

The Company also provides guidance for the third quarter ending September 30, 2023 as follows:

- Revenues to be within the range of $880 million to $920 million

- Non-GAAP gross margin** expected to be within the range of 28% to 31%

- Non- GAAP operating income** to be within the range of $115 million to $135 million

- Revenues from the solar segment to be within the range of $850 million to $890 million

- Gross margin from the solar segment expected to be within the range of 30% to 33%.

63.     Also on August 1, 2023, the Company held an earnings call for the second quarter of 2023 ("Q223 Earnings Call"). During the Q223 Earnings Call, Defendant Lando stated, in relevant part:

Revenues from our solar business were at a record $947 million while revenues from our nonsolar businesses were $44 million. This quarter, we shipped 5.5 million power optimizers and 335,000 inverters. This quarter, we also shipped 269 megawatt hours of residential batteries, a 22% increase from last quarter. Our solar business revenue grew quarter over quarter by 4% and by 38% year over year, mostly driven by record revenues in Europe, offset by a decrease in revenue in the United States and Rest of World. . . .

In Europe, installation rates continue to be high in both residential and commercial. However, the strength in the market is somewhat more moderate than what was anticipated heading into 2023, largely due to a milder winter, reduced concerns over energy resilience, and lower electricity prices. With that in mind, our growth in Europe in the second quarter was very strong. Overall, our megawatt shipments to Europe grew by 52% quarter over quarter, including 57% in residential and 50% quarter-over-quarter growth in commercial.

64.     Additionally, Defendant Faier touted the financial success of the Company, stating:

Total revenues for the second quarter were a record $991.3 million, a 5% increase compared to $943.9 million last quarter and 36% increase compared to $727.8 million for the same quarter last year. Revenues from our solar segment, which include the sales of residential batteries and trackers, were a record $947.4 million, a 4% increase compared to $908.5 million last quarter and a 38% increase compared to $687.6 million for the same quarter last year. Solar revenues from the United States this quarter were $195.6 million, a 23% decrease from the last quarter and a 37% decrease from the same quarter last year, representing 21% of our solar

revenues. Solar revenues from Europe were a record $688.5 million, a 19% increase from the last quarter and 112% increase from the same quarter last year, representing 73% of our solar revenues.

In Europe, we continue to see meaningful quarter-over-quarter revenue growth in general and noticeable records in Germany with 64% growth, reaching close to $300 million of quarterly revenues. Sweden with 106% growth, the United Kingdom with 50% quarter-over-quarter growth, and Slovenia with 54% growth. Revenues from batteries grew slightly this quarter in Europe, limited by the fact that we are still constrained by three-phase inverter supply, which is needed for battery-coupled systems. We do identify some excess battery inventory in the European channels, which will lead to lower battery shipments in the second half of the year.

This inventory buildup will be alleviated as the ramp-up in deliveries of our new three-phase residential backup inverter catches up with our battery manufacturing and delivery pace. . . .

65.    In response to a question about inventory balances during the 2Q23 Earnings Call,

Defendant Faier stated:

I'll start from Europe, again, being the center of our sales today. In Europe today, what we see is that the inventory levels, on one hand, are relatively high. But when you look at the days outstanding, which is a result of the sell-through from the channel, they are not high at all. They're actually at the normal level.

And when we are looking at the point-of-sale data of how much is being sold from the channels, we see record levels over the last two quarters that, to our understanding, are continuing, which means that in that case, the demand is there. The demand is fairly strong, not maybe as strong as people believed from the very beginning of the year, but still very strong. And therefore, you would say that the levels of inventory that the distributors have and maybe a little bit of change in patterns and making orders a little bit shorter time from the time that they need it because there is enough supply in the market creates a situation, where basically some of them even say that it will be one or two quarters, but not more than this until the inventory levels are adjusted because you don't see a big gap. The problem in Europe is that you go into the fourth quarter.

And going back to the normal days of solar, usually, the fourth quarter is seasonally low in Europe compared to the third quarter. . . .

66.    Later in the 2Q23 Earnings Call, when asked about inventory levels in Europe,

Defendant Lando stated:

At high level, it's probably in Europe, the inventory levels are still I would say, below a quarter, probably in the range of two months for some products like the three-phase inverters, it's less than a month. For some products like single-phase inverters, it's probably more than two months.

And historically, these are very reasonable inventory levels for the European market. What's happening is what we described, and I described before, is a dynamic where they're sitting on very, very large inventories modules and trying to control financials and in a way, maybe, call it, taking the risk or being on the edge in terms of the overall inventory levels that they are holding. But I think that the inventory levels in Europe are in that range and considered reasonable, maybe on the high end of reasonable. But considering the very high sales through and installation rates, it's not a major bubble, if you will.

67.     Furthermore, when asked about C&I backlogs during the 2Q23 Earnings Call, Defendant Faier stated:

So, I can tell you that we have a solid backlog for Q3, of course, Q4, and even Q1. From Q2, where we still take orders sometimes, by the way, we see a smaller backlog.

And I would estimate that over the next few quarters, we will see backlogs being shorter in nature compared to where they were a year ago. This is not necessarily indicative of the actual volumes, it simply means that we will turn more orders into revenues in the same quarter than maybe compared to the spoiled situation that we were a few quarters ago, where we knew before we started already that everything that we can manufacture, we can sell.

68.     On August 7, 2023, the Company filed its quarterly report for the second quarter of 2023 on a Form 10-Q with the SEC (the "2Q23 10-Q"). The 2Q23 10-Q touted the financial growth of the Company in 2023 compared to 2022, stating, in relevant part:

Revenues increased by $263.5 million, or 36.2%, in the three months ended June 30, 2023, as compared to the three months ended June 30, 2022, primarily due to (i) an increase of $256.3 million related to the number of inverters and power optimizers sold, with significant growth in revenues coming from Europe; and (ii) an increase of $34.7 million related to the number of residential batteries sold mainly in Europe. These increases were offset by a decrease of $28.6 million related to a decrease in the number of ancillary solar products sold. Revenues from outside of the U.S. comprised 80.3% of our revenues in the three months ended June 30, 2023 as compared to 57.3% in the three months ended June 30, 2022. . . .

Revenues increased by $552.3 million, or 39.9%, in the six months ended June 30, 2023 as compared to the six months ended June 30, 2022, primarily due to (i) an increase of $501.6 million related to an increase in the number of inverters and power optimizers sold, with significant growth in revenues coming from Europe; and (ii) an increase of $99.3 million related to an increase in the number of residential batteries sold mainly in Europe. Revenues from outside of the U.S. comprised 76.7% of our revenues in the six months ended June 30, 2023 as compared to 58.3% in the six months ended June 30, 2022.

69.     The 2Q23 10-Q was signed by Defendants Lando and Faier.

70.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) the Company's European distribution channels had high inventory levels; (ii) the Company was experiencing a significant amount of cancellations and pushouts of existing backlog from its European distributors; (iii) the Company's backlog and guidance was overstated; and (iv) as a result of the foregoing, the Individual Defendant's positive statements about the Company's finances, business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

***The Truth is Revealed***

71.     The truth was revealed when, on October 19, 2023, after the market closed, the Company issued the 3Q23 Preliminary Financial Results Press Release.

72.     In the 3Q23 Preliminary Financial Results Press Release, Defendant Lando revealed that "[d]uring the second part of the third quarter of 2023, we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors" and announced that "[w]e attribute these cancellations and pushouts to higher than expected inventory in the channels and slower than expected installation rates. In particular, installation rates for the third quarter were much slower at the end of the summer and in September where traditionally there is a rise in installation rates."

73.     The 3Q23 Preliminary Financial Results Press Release went on to state that:

As a result, third quarter revenue, gross margin and operating income will be below the low end of the prior guidance range. Additionally, the Company anticipates significantly lower revenues in the fourth quarter of 2023 as the inventory destocking process continues. . . .

Third quarter revenue is now expected to be in the range of $720 million to $730 million, compared to the previous expectation of $880 million to $920 million.

GAAP gross margin is now expected to be within the range of 19% to 20%.

Non-GAAP gross margin* is now expected to be within the range of 20.1% to 21.1%, compared to the previous expectation of 28% to 31%.

GAAP operating loss is now expected to be within the range of $9 million to $28 million.

Non-GAAP operating income* is now expected to be within the range of $12 million to $31 million, compared to the previous expectation of $115 million to $135 million.

74.     On this news, the Company's stock price fell $31.08 per share, or approximately 27%, to close at $82.90 per share on October 20, 2023.

75.     Then, on November 1, 2023, the Company confirmed its predictions in a press release announcing the financial results for the third quarter of 2023 (the "3Q23 Press Release"). In the 3Q23 Press Release, Defendant Lando stated "[t]he results for the third quarter fell short of our prior expectations and reflecting a slow market environment, which has resulted in high inventory of our products in the distribution channels, in particular in Europe."

76.     The 3Q23 Press Release went on to definitively reveal the Company's disappointing financial results, stating:

**Third Quarter 2023 Summary**

The Company reported revenues of $725.3 million, down 27% from $991.3 million in the prior quarter and down 13% from $836.7 million in the same quarter last year.

23

Revenues from the solar segment were $676.4 million, down 29% from $947.4 million in the prior quarter and down 14% from $788.6 million in the same quarter last year.

GAAP gross margin was 19.7%, down from 32.0% in the prior quarter and down from 26.5% in the same quarter last year.

Non-GAAP gross margin* was 20.8%, down from 32.7% in the prior quarter and down from 27.3% in the same quarter last year.

Gross margin from the solar segment was 24.0%, down from 34.7% in the prior quarter and down from 28.3% in the same quarter last year. . . .

77.     Later on November 1, 2023, the Company held its earnings call for the third quarter of 2023 (the "3Q23 Earnings Call"). In the 3Q23 Earnings Call, Defendant Lando stated, in relevant part:

As reflected in our preliminary announcement a few weeks ago and in the guidance we are giving today, we are going through challenging times in terms of general market dynamics and specific inventory trends related to our products. In the call today, we will share details of third-quarter sales and megawatt sell-through data aggregated from distributors in some of the regions and our latest estimates of underlying business levels in the near future and estimate how long it will take to reach the associated revenue level.

Before getting into the regional picture, I want to start with high-level perspective. During 2022 and, in particular, the second half of 2022, our industry went through an unprecedented surge in demand, which we attributed to geopolitical and other reasons discussed in our prior calls. Indicators in the beginning of 2023, where that demand would continue to increase this year, in particular in Europe. This led to a buildup of significant backlog for our products, in particular, because at the time, we faced operational challenges to supply over demand.

Specifically, this was related to three-phase commercial inverters that were in high demand and low supply in the late part of 2022, and our supply improved dramatically in early 2023. Additionally, in early 2023, we released in Europe a differentiated three-phase residential offering of a backup invertor and battery, which our customers were waiting for and excited to adopt. As a result of these factors, our shipments in the first half of 2023 were at record levels, and we were in the process of increasing capacity to meet the elevated channel demand. However, market demand began to slow in the third quarter, and distributors began to experience financial challenges.

As a result, we received a large amount of requests to cancel or push out orders.

We should note that while these orders are technically binding on our distributors, the nature of our relationship with these customers is such that we accommodated most of these requests. As a result, our third-quarter revenue and fourth-quarter expected revenues are significantly lower than our run rate in recent quarters, while the infrastructure we built to support the anticipated sales growth has created a burden that is putting pressure on our margins in the near term.

78.    On this news, the Company's stock price fell $3.00 per share, or approximately 4% per share, to close at $72.29 on November 1, 2023.

### Harm to the Company

79.    As a direct and proximate result of the Individual Defendants' misconduct, SolarEdge has lost and expended, and will lose and expend, millions of dollars.

80.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Lando and Faier, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

81.    Furthermore, the Securities Class Actions has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

83.    SolarEdge is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

84.    Plaintiff is a current shareholder of SolarEdge and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

85.     A pre-suit demand on the Board of SolarEdge is futile and, therefore, excused.  At the time this action was commenced, the eight-person Board consisted of Individual Defendants Zafrir, Atkins, Gani, Gross, Hoke, Lando, More, and Payne (the "Director Defendants"). As set forth below, all eight Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

86.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

87.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties. Specifically, Defendants Lando and Faier each signed the 1Q23 10-Q and the 2Q23 10-Q, attesting to the documents' accuracy.

88.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

89.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the

Company.

90.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

91.     Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

92.     Defendants Gani, Payne, and Gross (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

93.     The Director Defendants, as members of the Board, were and are subject to the Board's Code of Conduct. Additionally, Defendant Lando, as an officer of the Company, was and is subject to the Employee Code of Conduct. The Codes of Conduct go well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director

Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Codes of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Codes of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

94.     Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.     The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

97.     The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.     The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon

Plaintiff and others similarly situated.

99.     The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of SolarEdge were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in, the issuance or dissemination of such statements or documents as primary violations of the securities laws.

100.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of SolarEdge, their control over, and/or receipt and/or modification of SolarEdge's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning SolarEdge, participated in the fraudulent scheme alleged herein.

101.    As a result of the foregoing, the market price of SolarEdge common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of SolarEdge common stock in purchasing SolarEdge common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

102.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

**Against the Individual Defendants for Breach of Fiduciary Duty**

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

105.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

106.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

107.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

108.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

109.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

111.    Plaintiff on behalf of SolarEdge has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SolarEdge.

114.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from SolarEdge that was tied to the performance or artificially inflated valuation of SolarEdge, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

115.    Plaintiff, as a shareholder and a representative of SolarEdge, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

116.    Plaintiff on behalf of SolarEdge has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants for Waste of Corporate Assets**

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

119.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

120.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

121.    Plaintiff on behalf SolarEdge has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 15, 2024

**RIGRODSKY LAW, P.A.**

By:  */s/ Gina M. Serra*

Seth D. Rigrodsky

Timothy J. MacFall

Gina M. Serra

Vincent A. Licata

**OF COUNSEL:**

825 East Gate Boulevard, Suite 300

Garden City, NY 11530

**GRABAR LAW OFFICE**

Telephone: (516) 683-3516

Joshua H. Grabar (#5906953)

Email: sdr@rl-legal.com

One Liberty Place

tjm@rl-legal.com

1650 Market Street, Suite 3600

gms@rl-legal.com

Philadelphia, PA 19103

vl@rl-legal.com

Telephone: (267) 507-6085

Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*